USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  10/2/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
DENIS GALANIS,                            :
                                          :
                       Plaintiff,         :
                                          :          1:13-cv-4344-GHW
          -against-                       :
                                          :          MEMORANDUM OPINION
THE HARMONIE CLUB OF THE CITY OF          :          AND ORDER
NEW YORK and CHRISTOPHER CAREY,           :
                                          :
                       Defendants.        :
--------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

Defendants the Harmonie Club of the City of New York and Christopher Carey move to enforce a settlement agreement purportedly entered into with plaintiff Denis Galanis in Galanis's employment discrimination action.  The Court holds that the parties entered into an enforceable agreement to settle Galanis's claims.  Accordingly, Defendants' motion is granted and Galanis's claims are dismissed.

I.    **Background**[1]

In June 2013, Galanis, through counsel Ioannis P. Sipsas, filed a complaint against the Harmonie Club of the City of New York (the "Club"), a private social club at which Galanis was employed as a waiter, and Christopher Carey, the Club's General Manager.  *See* Dkt. No. 1.  Galanis raised claims of, *inter alia*, age discrimination under the Age Discrimination in Employment Act ("ADEA") and the parallel provisions of New York state and City law, as well as a claim of "aider and abettor" liability under state law.[2]  *See id.*

---

[1] The following facts are derived from the affidavits and exhibits filed in connection with Defendants' motion to enforce the settlement agreement and Galanis's opposition to that motion, as well as from the documents filed in prior stages of this case.  Because the material facts are undisputed, the Court has resolved Defendants' motion without holding an evidentiary hearing.  *See, e.g., Reich v. Best Built Homes, Inc.*, 895 F.Supp. 47, 49 (W.D.N.Y. 1995) (indicating that an evidentiary hearing is required in this context only "where the material facts concerning the existence or terms of an agreement to settle are in dispute" (internal quotation marks omitted)).

[2] In January 2014, on Defendants' motion, the Court dismissed various other claims that Galanis had raised for failure to state a cause of action.  *See* Dkt. No. 25.

In March 2014, the parties participated in a Court ordered mediation session.  *See* March 19, 2014 Dkt. Entry.  Although they exchanged settlement offers, the parties were unable to reach a settlement during the mediation session.  *See* Dkt. No. 78, Declaration of Brian J. Turoff in Support of Motion to Enforce Settlement Agreement ("Turoff Decl.") ¶¶ 4-5.  The parties nonetheless continued to engage in settlement discussions.  *Id.* ¶ 5.

On May 28, 2014, in response to an email offer from Mr. Sipsas, Defendants agreed to make a lump-sum payment in exchange for, *inter alia*, Galanis dismissing this action with prejudice, providing a release to Defendants, resigning from his employment with the Club, refraining from disparaging Defendants, and maintaining the confidentiality of the terms of the parties' agreement. *Id.* ¶¶ 6-7.  According to Galanis, however, he had not authorized Mr. Sipsas to settle the case on his behalf and did not agree to the terms of the settlement at the time.  *See* Dkt. No. 68, Affidavit of Denis Galanis in Opposition to Motion to Enforce Settlement Agreement ("Galanis Aff.) ¶ 9.

Nonetheless, based on the agreement, Defendants advised the Court by letter dated May 28, 2014 that the parties had reached a settlement in principle and were in the process of completing a final settlement document.  *See* Dkt. No. 42 at 2.  In light of Defendants' representation, the Court dismissed this action on the same day, subject to each party's right to reinstate the action within 15 days.  *Id.* at 1.

On June 4, 2014, however, Mr. Sipsas informed the Court by letter that Galanis had asked Mr. Sipsas to "retrieve [Galanis's] consent [to the] settlement" and to withdraw from representing Galanis.  *See* Dkt. No. 43 at 1.  Mr. Sipsas attached to his submission two sworn letters addressed to him from Galanis dated June 4, 2014.  *See* Dkt. No. 43, Ex. A.  In one letter, Galanis stated, "Please be informed that I have decided, after I thought things through one more time, that I do not want to accept the settlement that I agreed to previously."  *Id.* at 1.  In the other letter, Galanis stated, "This is to notify you that I wish to terminate your representation in the referenced case, effectively [sic]

immediately." *Id.* at 2.  Citing Galanis's apparent disavowal of the settlement agreement, the Court reopened the case.  *See* Dkt. No. 44.

On June 10, 2014, Mr. Sipsas formally moved to withdraw as Galanis's counsel.  *See* Dkt. No. 48.  In support of his motion, Mr. Sipsas asserted that he and Galanis "strongly disagree[d] on litigation strategies," that there had been a "break-down of substantive communications" between he and Galanis, and that Galanis had "indicated that he no longer wishes to be represented by [Mr. Sipsas]."  *Id.* at 1.

On June 13, 2014, while decision on Mr. Sipsas's motion to withdraw remained pending, Mr. Sipsas called Galanis and asked him come to Mr. Sipsas's office to discuss the case.  Galanis Aff. ¶ 11.  Galanis "decided to meet Mr. Sipsas at his office to hear what he wanted to discuss, although at no time did [Galanis] consider [Mr. Sipsas] to be [his] lawyer or [to] have any authority to settle this matter on [his] behalf or continue to represent [him] in any other way."  *Id.* ¶ 12.  Upon meeting at Mr. Sipsas's office, Mr. Sipsas "advised [Galanis] that Defendants had made a second offer to settle [his] case and that the offer was fair."  *Id.* ¶ 13.  "As a result of Mr. Sipsas's tone in advising [Galanis] [of] the settlement offer, [Galanis] felt pressured and threatened to accept Defendants' terms."  *Id.* ¶ 14.  Galanis "agreed to make a phone call with Mr. Sipsas to Defendants' counsel" to discuss the offer.  *Id.* ¶ 15.

Brian J. Turoff, counsel for Defendants, subsequently received a telephone call in which both Mr. Sipsas and Galanis were on the line.  Turoff Aff. ¶ 16.  Mr. Sipsas advised Mr. Turoff that Galanis "now wanted to resolve the case on the same terms that had been previously agreed to on May 28, 2014."  *Id.*  Additionally, Galanis himself "indicated that he had made a mistake in attempting to reject the Agreement, and that he now wanted to settle the case on the terms as agreed to on May 28, 2014."  *Id.*  Mr. Turoff stated that he needed to speak with his client and that he would call Mr. Sipsas back.  Dkt. No. 81, Declaration of Ioannis P. Sipsas in Support of Motion to Enforce Settlement Agreement ("Sipsas Decl.") ¶ 3.

Mr. Turoff called Mr. Sipsas and Galanis back shortly thereafter, at which point "the parties discussed, listed, and agreed to one-by-one, each and every material term of the Agreement," and Galanis "personally agreed to and confirmed that he understood all of the agreement's material terms." *Id.* ¶ 4. As summarized by Mr. Turoff:

> The parties, again including Plaintiff himself, then reaffirmed their binding settlement agreement. Specifically, the parties explicitly enumerated and agreed to, one by one, each and every material term of the Agreement, including, without limitation, the settlement amount and its breakdown, Plaintiff's resignation from the club, the release, . . . and the confidentiality and non-disparagement provisions. Even the Agreement's governing law, New York, was expressly agreed to.

Turoff Decl. ¶ 17. Crucially, "[t]he parties also explicitly stated and agreed that this oral agreement was an immediately enforceable and binding contract, irrespective of whether the Agreement was memorialized in a 'formal' settlement agreement." *Id.* ¶ 18; *accord* Sipsas Decl. ¶ 4 ("Plaintiff also explicitly agreed that this agreement was immediately binding and enforceable, irrespective of whether the agreement was memorialized in a written settlement agreement.").

Although Galanis does not provide a detailed account of the parties' June 13, 2014 conversation, for the most part he has not challenged Mr. Turoff's or Mr. Sipsas's descriptions of that conversation in his motion papers.[3] Galanis agrees that during the phone call, he "stated that certain terms of the offer were agreeable to [him]." Galanis Aff. ¶ 19. Galanis emphasizes, however, that he "fully expected that [he] would not be bound to any agreement until it was in writing and signed by [him] personally," that "at no time during the phone call did [he] consider Mr. Sipsas to be authorized to accept a settlement offer on [his] behalf," and that he "felt pressured by both Mr. Sipsas and [Mr. Turoff] during the phone call to agree to the terms they were discussing." *Id.* ¶¶ 17, 19, 21.

---

[3] To the extent Mr. Turoff's and Mr. Sipsas's accounts of Galanis's statements during the above conversation constitute hearsay, Galanis has waived any hearsay objection to this evidence by failing to raise such an objection in his motion papers. *See* Fed. R. Evid. 103(a)(1).

Galanis and Mr. Sipsas then "indicated during [the] call that [Galanis] wanted to personally inform the Court of the parties' agreement." Turoff Decl. ¶ 19. Accordingly, Galanis and counsel for both sides jointly called the Court and conveyed the above information to one of the Court's law clerks, who advised the parties to submit a letter to the same effect. *Id.* ¶ 20. In a June 13, 2014 letter filed and signed by Mr. Turoff only, the Court was advised as follows:

> The parties submit the instant letter jointly to advise that, by way of telephone conversations involving Plaintiff himself, Plaintiff's counsel John Sipsas, and Defendants' counsel, Plaintiff explicitly confirmed today that he has agreed to all terms of a binding settlement agreement in this matter. While the parties intend to memorialize the agreement's terms in a writing, the parties have explicitly agreed that, even in the absence of such a writing, the parties are bound by the terms of the oral agreement that has been reached. The parties' agreement does not depend upon the existence of a writing. The parties—including Plaintiff himself speaking from the office of Plaintiff's counsel—orally listed in detail, and agreed upon, all of the agreement's material terms.
>
> Given this development, . . . the parties now mutually consider this matter to be closed, and respectfully request that it be dismissed with prejudice.

Dkt. No. 52. In light of the above representations, the Court again dismissed the case, subject to each party's right to reinstate the action within 30 days. *See* Dkt. No. 53.

On the same day that the above telephone conversation occurred and the above letter was filed, Mr. Sipsas and Mr. Turoff confirmed the parties' oral agreement in a series of emails, which have since been filed with the Court. *See* Turoff Decl., Ex. D. Specifically, in an email to Mr. Sipsas, Mr. Turoff confirmed that, "even in the absence of a writing, the following terms constitute an agreement and are binding upon the parties." *Id.* at 1. Mr. Turoff proceeded to list each term that the parties had orally agreed upon. *Id.* at 1-2. Additionally, Mr. Turoff communicated his "understanding that [Mr. Sipsas had] the authority to enter into this agreement on Mr. Galanis's behalf despite [his] prior motion to withdraw from the case." *Id.* at 2. Mr. Sipsas responded by confirming that the parties were "in agreement as to the terms of the settlement outlined in [Mr. Turoff's] . . . email." *Id.* at 5. In a subsequent email, Mr. Turoff inquired, "Just to make sure that

I'm accurately understanding your email, we are in agreement as to all terms . . . correct?" *Id.* at 6. Mr. Sipsas responded, "Yes." *Id.* at 7.

On July 1, 2014, Mr. Turoff emailed Mr. Sipsas a draft of a formal written settlement agreement. *See* Dkt. No. 69, Declaration of Mathew W. Beckwith ("Beckwith Decl."), Ex. 1. Though more detailed, the material terms of the draft agreement were consistent with the parties' June 13, 2014 oral agreement. *Compare id.*, *with* Turoff Decl., Ex. D at 1-2.

On or about the same day, Galanis retained Matthew W. Beckwith as new counsel. *See* Dkt. No. 54. On July 14, 2014, Mr. Beckwith informed the Court by letter that Galanis "does not agree to the terms of the purported settlement and seeks to proceed with the litigation." Dkt. No. 56. Based on this representation, the Court again reopened the case. *See* Dkt. No. 58. Finally, on July 18, 2014, the Court granted Mr. Sipsas's motion to withdraw as counsel.[4] *See* Dkt. No. 59.

## II.    Motion to Enforce Settlement Agreement

Defendants now move to enforce the settlement agreement purportedly entered into between the parties on June 13, 2014.[5] In arguing that the settlement agreement is enforceable, Defendants emphasize that the parties explicitly agreed that the enforceability of the settlement did not depend on the existence of a formal written document and, in any event, that the parties memorialized their agreement in writing via email. *See* Dkt. No. 78, Memorandum of Law in Support of Defendants' Motion to Enforce Settlement Agreement ("Def. Mem."). Defendants further contend that the parties agreed to all of the material terms of the settlement agreement, that the terms of the agreement are not complex, and that the parties have already begun performing the

---

[4] Although Mr. Beckwith filed a stipulation in which he purported to substitute himself for Mr. Sipsas as counsel of record on July 2, 2014, *see* Dkt. No. 54, that stipulation was not endorsed by the Court and thus was not effective, *see* S.D.N.Y. Local Civil Rule 1.4 ("An attorney who has appeared as attorney of record for a party may be relieved or displaced only by order of the Court and may not withdraw from a case without leave of the Court granted by order.").

[5] Defendants also argue that the parties entered into an enforceable settlement agreement with identical terms on May 28, 2014. The Court declines to address this argument in light of its conclusion that the June 13, 2014 agreement is enforceable

agreement by carrying out its confidentiality and non-disparagement provisions and cancelling a previously scheduled settlement conference with the Court.  *Id.*

In opposing Defendants' motion, Galanis argues that, despite the parties' agreement that their settlement did not depend on the existence of a writing, "many other factors contradict this [agreement]."  *See* Dkt. No. 67, Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Enforce Settlement Agreement ("Pl. Mem.") at 5.  Galanis specifically refers to the facts that "the parties ended the [June 13, 2014 conference] call [by] discussing the exchange of a draft settlement agreement to [be] reviewed and executed by the parties," and that the draft settlement agreement emailed on July 1, 2014 contains a merger clause and certain language indicating that it is not effective until signed.  *Id.* at 5-7.  Additionally, Galanis counters Defendants' argument that they have begun performing the agreement's confidentiality and non-disparagement provisions by contending that those provisions do not apply to Defendants, and asserts that the terms of the agreement remained to be negotiated by highlighting various purported "substantial differences" between the parties' June 13, 2014 oral agreement and the July 1, 2014 draft agreement.  *Id.* at 7-9. Galanis separately argues that he did not have a reasonable amount of time to consider the agreement, as required under the Older Works Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f).  *Id.* at 10-11.

## III.   Analysis[6]

### A.   Settlement Authority

---

[6] The parties have not addressed whether the enforceability of their settlement agreement should be evaluated under New York law or federal common law.  The Court, however, is not required to decide this question, which has not been resolved by the Second Circuit.  *See Powell v. Omnicom*, 497 F.3d 124, 129 n.1 (2d Cir. 2007).  The principles of New York law and federal common law regarding the enforceability of settlement agreements are "materially indistinguishable," such that the Court may apply the two sets of laws "interchangeably."  *Id.*  The Court acknowledges that, according to Defendants, the parties orally agreed that their settlement agreement would be governed by New York law.  *See* Turoff Decl. ¶ 17.  Galanis, however, appears to dispute this assertion, *see* Pl. Mem. at 9, and, in any event, "[a]pplying [a] choice-of-law clause to resolve [a] contract formation issue would presume the applicability of a provision before its adoption by the parties has been established," *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012).

Before determining whether the parties intended to enter into a binding settlement agreement, the Court considers the threshold issue of whether Galanis's former counsel, Mr. Sipsas, had the authority to enter into such an agreement on Galanis's behalf.  To be sure, the record in this case indicates that *Galanis himself* orally agreed to the terms of the parties' settlement on June 13, 2014, such that Mr. Sipsas arguably did not need settlement authority in order for Galanis to be bound.  *See* Turoff Decl. ¶¶ 16-17; Sipsas Decl. ¶ 4; Galanis Aff. ¶ 19.  Nonetheless, the question of Mr. Sipsas's authority is relevant to the analysis because Mr. Sipsas confirmed that Galanis had orally agreed to the parties' settlement in a series of emails exchanged with Defendants' counsel, and, ultimately, confirmed in writing Galanis's approval of the settlement agreement.

Curiously, although Galanis asserts in recounting the relevant facts that Mr. Sipsas lacked the authority to settle on his behalf, *see* Pl. Mem. at 1-2, he does not proceed to employ this assertion in support of an argument that the parties' settlement agreement is unenforceable, *see Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) ("To make a legal argument is to advance one's contentions by connecting law to facts . . . .").  Moreover, while it is Defendants' ultimate burden as movants in this case to demonstrate that the parties' agreement is enforceable, *see Benicorp Ins. Co. v. Nat'l Medical Health Card Systems, Inc.*, 447 F.Supp.2d 329, 335 (S.D.N.Y. 2006), a party who challenges an attorney's authority to settle bears the burden of proving that the attorney lacked such authority, *In re Artha Mgmt., Inc.*, 91 F.3d 326, 329 (2d Cir. 1996); *see also United States v. Int'l Bhd. of Teamsters*, 986 F.2d 15, 20 (2d Cir. 1993) ("The burden of proving that an attorney entered into a settlement agreement without authority is not insubstantial.").  The Court nonetheless deems the issue of Mr. Sipsas's settlement authority to be sufficiently raised in Galanis's opposition papers to warrant consideration.

Although the decision to settle a case rests with the client alone, a client may authorize his attorney to enter into a settlement agreement on his behalf.  *See Int'l Bhd. of Teamsters*, 986 F.2d at 19-20.  An attorney's settlement authority may be actual or apparent.  *See id.*  The law of agency governs

the question of whether an attorney has actual or apparent settlement authority.  *Joseph v. Worldwide Flight Services, Inc.*, 480 F.Supp.2d 646, 653 (E.D.N.Y. 2007).  Under the law of agency, "actual authority may be inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act."  *Int'l Bhd. of Teamsters*, 986 F.2d at 20.  Apparent authority, by contrast, "arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him."  *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 289 (2d Cir. 2003) (internal quotation marks omitted).  An attorney thus cannot "create apparent authority by his own actions or representations," and "[a] client does not create apparent authority for his attorney to settle a case merely by retaining the attorney."  *Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989); *see also Vesterhalt v. City of N.Y.*, 667 F.Supp.2d 292, 303 (S.D.N.Y. 2009) ("Apparent authority is created only by affirmative representations of the principal to the third party, and does not arise out of things that the principal fails to say to opposing counsel." (citing *Fennell*, 865 F.2d at 502)).  Nonetheless, it is "presume[d] that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so," *Artha Mgmt.*, 91 F.3d at 329, and "if an attorney has apparent authority to settle a case, and the opposing counsel has no reason to doubt that authority, the settlement will be upheld."  *Fennell*, 865 F.2d at 502.

Here, the Court is not required to decide whether Mr. Sipsas had actual authority to settle the case on Galanis's behalf on June 13, 2014, as Galanis has not demonstrated that Mr. Sipsas lacked apparent settlement authority on that date.  Crucially, the evidence in the record demonstrates that Galanis himself participated in the June 13, 2014 telephone conference in which the parties reached their agreement, and that Galanis himself agreed to the agreement's material terms.  *See* Turoff Decl. ¶¶ 16-17; Sipsas Decl. ¶ 4.  Based on Galanis's own affirmative representations and conduct in participating in the settlement discussions and agreeing to the settlement's terms, it was

reasonable for Defendants' counsel to believe that Mr. Sipsas had the authority to settle this case on Galanis's behalf.[7]  *See, e.g., Moore v. Consolidated Edison Co. of N.Y., Inc.*, No. 00 Civ. 7384(PAC)(KNF), 2007 WL 2728657, at *4 (S.D.N.Y. Sept. 19, 2007) (holding that defendant's counsel had no reason to doubt the existence of plaintiff's counsel's settlement authority because, *inter alia*, plaintiff herself attended and participated in settlement discussions).

This conclusion is not undermined by the facts that, in the days prior to the parties reaching an agreement, Galanis had filed with the Court an affidavit stating he wished to terminate Mr. Sipsas's representation, and Mr. Sipsas had moved to withdraw as Galanis's counsel.  Although Defendants' counsel was presumably aware of these facts, Galanis's purported termination of Mr. Sipsas's representation was not fully effective until the Court granted Mr. Sipsas's motion to withdraw on July 18, 2014.  *See* 7A C.J.S. Attorney & Client § 270 ("An attorney who has appeared as the attorney of record in a cause cannot effectively terminate the relation by withdrawal until he or she has made application to the court and obtained leave to make a formal withdrawal of record; and, if this is not done, the relation continues until the end of the litigation, at least, so far as the court and the opposing party are concerned." (footnotes omitted)); *accord* Local Civil Rule 1.4.  In the meantime, Galanis was of course free to reconsider his purported decision to terminate Mr. Sipsas's representation, and, based on his conduct in participating in the parties' settlement discussions on June 13, 2014, it would be have been reasonable for Defendants' counsel to believe that Galanis had, in fact, reconsidered that decision.  Accordingly, at least from the standpoint of apparent authority, the record does not support Galanis's assertion that Mr. Sipsas was not authorized to settle this case on his behalf.  *Cf. Rahman v. Kaplan Cornelia, Inc.*, No. 12-CV-09095 (SN), 2014 WL 541851, at *9 (S.D.N.Y. Feb. 11, 2014) (declining to credit client's testimony that his attorney lacked settlement authority because, *inter alia*, the client's "own conduct was not consistent

---

[7] In an email to Mr. Sipsas sent later that same day, Defendants' counsel confirmed his "understanding that [Mr. Sipsas had] the authority to enter into this agreement on Mr. Galanis's behalf despite [his] prior motion to withdraw from the case."  Turoff Decl., Ex. D at 2.

with someone who had consistently rejected a settlement").  In any event, though he at least nominally raises this issue, Galanis fails to satisfy his burden of proving otherwise in his glancing treatment of the issue in his motion papers.

### B.      Existence of a Binding Settlement Agreement

"A settlement agreement is a contract that is interpreted according to general principles of contract law."  *Omega Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).  "It is an elementary principle of contract law that a party's subsequent change of heart will not unmake a bargain already made."  *Id.* at 445.  Thus, once a court concludes that the parties reached a binding settlement agreement, the agreement is enforceable, "even if a party has a change of heart between the time he agreed to the settlement and the time those terms are reduced to writing."  *Powell*, 497 F.3d at 129.

Here, shortly after orally agreeing to the terms of their settlement on June 13, 2014, counsel for both sides exchanged a series of emails in which they listed and confirmed their agreement to each term of the parties' settlement.  *See* Turoff Decl., Ex. D.  Arguably, the Court could end its analysis here and enforce the agreement.  Agreements that address all negotiated terms in an email are generally enforceable in the same manner as more formal written agreements.  *See Rahman*, 2014 WL 541851, at *4; *see also Stevens v. Publicis, S.A.*, 854 N.Y.S.2d 690, 692 (1st Dep't 2008) ("[E]-mails . . . constitute 'signed writings' within the meaning of the statute of frauds, since [the party's] name at the end of his e-mail signifie[s] his intent to authenticate the contents."); *but see Bulldog New York LLC v. Pepsico, Inc.*, ---F.Supp.---, 2014 WL 1284903, at *11 (D. Conn. Mar. 31, 2014) (citing cases for the proposition that, "[u]nder New York law, the sufficiency of an email to act as a signed writing is not settled").  Here, in an email to Mr. Sipsas, Defendants' counsel, Mr. Turoff, confirmed that, "the following terms constitute an agreement and are binding upon the parties."  *Id.* at 1.  Mr. Turoff proceeded to list each term that the parties had orally agreed upon.  *Id.* at 1-2.  Mr. Sipsas responded by confirming that the parties were "in agreement as to the terms of the settlement

outlined in [Mr. Turoff's] . . . email." *Id.* at 5.  The parties thereby reached an enforceable written agreement.  Nonetheless, because there may be circumstances under which a party reserves a right to be bound only by a more formal signed writing, the Court will proceed to examine whether such circumstances exist here.

Where there is no final document on which to rely, the controlling factor in determining whether parties are bound by an agreement is whether a court has evidence of the parties' intent to be bound.  *See id.*  Because a court cannot decipher the "secret or subjective intent" of the parties, "it is the objective intent . . . that controls."  *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997); *accord Adjustrite Systems, Inc. v. GAB Business Services, Inc.*, 145 F.3d 543, 549 (2d Cir. 1998) ("To discern . . . intent a court must look to the words and deeds [of the parties] which constitute objective signs in a given set of circumstances." (internal quotation marks omitted)).  In deciding whether parties intended to be bound in the absence of a formal written agreement, courts in this Circuit consider the following factors: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing."  *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).

### 1.   Express Reservation of the Right Not to Be Bound in the Absence of a Writing

The first factor identified by the Second Circuit in *Winston*—whether there has been an express reservation of the right not to be bound absent a writing—"is frequently the most important."  *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005).  Here, this factor requires little discussion.  It is undisputed that, in reaching an oral agreement on June 13, 2014, the parties "explicitly . . . agreed that this oral agreement was an immediately enforceable and binding contract, irrespective of whether the Agreement was memorialized in a 'formal' settlement agreement."

Turoff Decl. ¶ 18; *accord* Sipsas Decl. ¶ 4.  The parties' explicit agreement to be bound in the absence of a formal writing was then memorialized in both an email from Defendants' counsel to Galanis's counsel, *see* Turoff Decl., Ex. D at 1 (confirming that, "even in the absence of a writing, the following terms constitute an agreement and are binding upon the parties"), and in a letter filed with the Court, *see* Dkt. No. 52 ("Plaintiff explicitly confirmed today that he has agreed to all terms of a binding settlement agreement in this matter.  While the parties intend to memorialize the agreement's terms in a writing, the parties have explicitly agreed that, even in the absence of such a writing, the parties are bound by the terms of the oral agreement that has been reached.").  Thus, pursuant to their explicit agreement, the parties clearly did not reserve the right to be bound only by a writing.  To the extent Galanis asserts that he "fully expected that [he] would not be bound to any agreement until it was in writing," Galanis Aff. ¶ 19, the Court cannot credit Galanis's subjective expectations where they are contradicted by the objective evidence in the record, *see Klos*, 133 F.3d at 168 ("When interpreting the meaning of a contract, it is the objective intent of the parties that controls.  The secret or subjective intent of the parties is irrelevant." (citation omitted)).

Furthermore, contrary to Galanis's argument, *see* Pl. Mem. at 5-7, the parties' objective expressions of their intent to reduce the terms of their agreement to a formal writing did not "contradict" their agreement to be bound in the absence of such a writing.  It was fully consistent for the parties to agree both that they would be immediately bound in the absence of a formal writing and that they would later execute such a writing.  *See, e.g., Powell*, 497 F.3d at 129 ("Parties may enter into a binding contract orally, and the intention to commit an agreement to writing, standing alone, will not prevent contract formation."); *Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V v. AT&T Communications, Inc.*, 92 Civ. 7862, 1994 WL 463014 at *3 (S.D.N.Y. Aug. 24, 1994) ("'[P]arties are free to enter into a binding contract without memorializing their agreement in a fully executed document.'  Parties who intend to be bound by informal agreement are so bound even if

13

they contemplate later memorializing their agreement in writing." (quoting *Winston*, 777 F.2d at 80) (citation omitted)).

Relying on the Second Circuit's decision in *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320 (2d Cir. 1997), Galanis points to certain language in the parties' July 1, 2014 draft settlement agreement indicating that the agreement would not be effective until signed and would supersede all prior agreements between the parties.  In *Ciaramella*, the Second Circuit determined that similar language in a proposed settlement agreement indicated that the parties did not intend to bind themselves until that agreement had been signed.  *See id.* at 324-25.  Unlike the parties in *Ciaramella*, however, the parties in this case confirmed the terms of their agreement in a detailed email exchange and explicitly agreed that they were bound in the absence of a more formal written agreement.  As a result, the Court is not required to examine the terms of the parties' subsequent draft written agreement in ascertaining the parties' intent.  The Court's inquiry into whether the parties intended to reserve their right to be bound only by a writing begins and ends with their undisputed, clear, and explicit agreement that they did not reserve that right.  *Cf. Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) ("[E]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." (internal quotation marks omitted)).

The first *Winston* factor thus weighs heavily in favor of enforcing the parties' June 13, 2014 settlement agreement.  Indeed, given that the *Winston* factors are designed to assist courts in determining "whether the parties intended to be bound in the absence of a document executed by both sides," *Winston*, 777 F.2d at 80, the parties' explicit agreement in this case that they would be so bound should arguably be deemed decisive, *cf. Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72-73 (2d Cir. 1989) (stating that the Court "need look no further than the first factor" where language in the parties' purported agreement established an intent not to be bound); *see also Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) ("The primary objective of a court in interpreting a contract is to give

14

effect to the intent of the parties as revealed by the language of their agreement."); *Henchman's Leasing Corp. v. Condren*, No. 87 CIV. 6478 (PNL), 1989 WL 11440, at *7 (S.D.N.Y. Feb. 8, 1989) ("The four [*Winston*] factors are, of course, not determinative but are merely suggested by the Court of Appeals for the light they may shed on . . . contractual intent."); *but see Ciaramella*, 131 F.3d at 323 ("No single [*Winston*] factor is decisive . . . ."). Nonetheless, in the interest of thoroughness, the Court will proceed to consider the remaining factors before deciding whether to enforce the parties' agreement.

### 2.   Partial Performance

"[P]atrial performance is an unmistakable signal that one party believes there is a contract . . . ." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984). In this case, one of the terms of the parties' June 13, 2014 agreement was that Galanis would dismiss his claims against Defendants with prejudice. *See* Turoff Decl., Ex. D, at 1. Shortly after entering into that agreement, counsel for Defendants filed a letter on behalf of both parties informing the Court of the parties' settlement and requesting that the case be dismissed with prejudice. *See* Dkt. No. 52. Although not signed by Galanis or his counsel, this letter was indisputably filed with both parties' consent. Galanis and his counsel also called the Court together with Defendants' counsel to advise the Court of their settlement and to request the dismissal of the action, as reflected in that letter. Courts in this Circuit have concluded that similar conduct designed to secure the dismissal of a case constitutes partial performance of a settlement agreement. *See, e.g., Jackson v. New York City Dep't of Educ.*, No. 10 CIV. 9193(DLC), 2012 WL 1986593, at *3 (S.D.N.Y. June 4, 2012) (finding partial performance of a settlement agreement based on, *inter alia*, the fact that the parties "communicated [their] settlement to the Court"); *Marino Institute of Continuing Legal Educ., Inc. v. Issa*, No. 12 Civ. 4320(KPF), 2013 WL 6723614, at *6 (S.D.N.Y. Dec. 20, 2013) (finding partial performance of a settlement agreement based on, *inter alia*, the fact that the parties drafted a stipulation of discontinuance); *Mason Tender Dist. Council of Greater New York v. Concore Equipment, Inc.*, No. 10 Civ.

4227(RWS), 2011 WL 5548912, at *11 (S.D.N.Y. Nov. 10, 2011) ("There has been partial

performance in this matter in that Plaintiffs forwarded a proposed formal stipulation, and Plaintiffs'

claims were dismissed by the Court under the belief that the parties had settled the 2003

Litigation."). At the very least, the June 13 call and letter constitute evidence that Galanis

considered himself bound by the parties' June 13, 2014 agreement in that he took action towards

performing one of its material terms. The second *Winston* factor thus also favors enforcing the

parties' agreement.[8]

### 3.  Completeness of Agreement

Because "[t]he actual drafting of a written instrument will frequently reveal points of

disagreement, ambiguity, or omission which must be worked out prior to execution," *Winston*, 777

F.2d at 82 (internal quotation marks omitted), "even 'minor' or 'technical' changes arising from

negotiations over the written language of an agreement can weigh against a conclusion that the

parties intended to be bound absent a formal writing," *Powell*, 497 F.3d at 130. "Such changes are

relevant, however, only if they show that there were points remaining to be negotiated such that the

parties would not wish to be bound until they synthesized a writing satisfactory to both sides in

every respect." *Id.* (internal quotation marks omitted). More generally, in analyzing this factor,

courts have focused on whether the parties reached an agreement with respect to all material or

---

[8] The Court disagrees with Defendants' assertion that the parties' partially performed their agreement by carrying out its confidentiality and non-disparagement provisions. Although there is no evidence that the parties disparaged each other or disclosed the terms of their agreement immediately after entering into that agreement, there is also no evidence linking this inactivity to an intent to carry out the agreement's terms. Moreover, even if it nominally applied to both parties, the agreement's confidentiality provision was clearly designed to benefit Defendants only. As a result, Defendants' adherence to that provision cannot be deemed partial performance. *See Gorodensky v. Mitsubishi Pulp Sales (MC), Inc.*, 92 F.Supp.2d 249, 256 (S.D.N.Y. 2000) ("[P]artial performance of the contract must secure a benefit to the other party . . . ."). Nor does the Court agree with Defendants' assertion that the parties partially performed their agreement by cancelling a settlement conference, since cancellation of that conference was not one of the agreement's terms. *See Alvarado v. Five Town Car Wash, Inc.*, No. 13 CV 1672(RJD)(JO), 2014 WL 252015, at *2 (E.D.N.Y. Jan. 22, 2014) ("The plaintiff suggests that he has rendered partial performance both because he has not resumed active litigation of this case and because he sent an email to the defendant promising to draft a written agreement. Neither suggestion suffices. The terms to which the parties orally agreed did not include either refraining from further action in the litigation or sending an email discussing the drafting of a written agreement . . . . The things that the plaintiff describes as partial performance are instead merely the natural consequences of pursuing an agreement to enter a written settlement agreement.").

essential terms. *See, e.g., id.* (affirming enforcement of settlement agreement where "the parties agreed to all of the material terms of the [that] agreement"); *Vacold LLC v. Cerami*, 545 F.3d 114, 129 (2d Cir. 2008) (affirming enforcement of an agreement where there was "no evidence from which [the Court] could conclude that the parties left material terms of their agreement open to further negotiation"); *Singer v. Xipto Inc.*, 852 F.Supp.2d 416, 425 n.7 (S.D.N.Y. 2012) ("[T]he undecided nature of the interest [term of the parties' agreement] is only relevant [to the agreement's enforceability] if it is an 'essential' or 'material' term of the Parties' bargain."); *see also Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996) (indicating that a binding agreement exists where "all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities"); *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." (internal quotation marks omitted)).

Here, the record demonstrates that the parties reached an agreement as to all of the material terms of their settlement on June 13, 2014. *See, e.g.,* Sipsas Decl. ¶ 4 (affirming that "the parties discussed, listed, and agreed to one-by-one, each and every material term of the Agreement" during their June 13, 2014 conference call); Turoff Decl., Ex. D at 6-7 (emails between counsel confirming that the parties were "in agreement as to all terms"). As noted, the July 1, 2014 draft of the parties' formal written agreement is substantively consistent with their June 13, 2014 agreement. *Compare* Turoff Decl., Ex. D at 1-2, *with* Beckwith Decl., Ex. 1. In arguing to the contrary, Galanis asserts that, unlike the July 1, 2014 draft agreement, the parties' June 13, 2014 agreement contained no choice of law provision. Galanis, however, does not cite any evidence in support of this assertion, which is inconsistent with the affirmation of Defendants' counsel. *See* Turoff Decl. ¶ 17.[9] In any

---

[9] The Court nonetheless notes that Galanis's assertion finds some support in the record. Specifically, Mr. Turoff's June 13, 2014 email confirming the terms of the parties' oral agreement contains no choice of law provision, *see* Turoff Decl.,

event, there is no basis for concluding that the choice of governing law was material to the parties'
settlement, such that any failure to resolve this term would be indicative of an intent not to be
bound absent a formal writing that included it.

Similarly, while Galanis identifies various differences in the language used to describe the
confidentiality and release provisions set forth in the June 13, 2014 agreement and July 1, 2014 draft
agreement, *see* Pl. Mem. at 9, there is no indication that those differences are material or even
substantive, *cf., Aguiar v. New York*, No. 06 Civ. 03334 (THK), 2008 WL 4386761, at *9 (S.D.N.Y.
Sept. 25, 2008) ("[S]imply because the parties did not set forth the language of [certain] provisions
verbatim does not signify that they had not agreed to be bound until a writing containing the
wording of those provisions was agreed to and signed."); *Singer*, 852 F.Supp.2d at 425 ("[I]t is not
relevant that 'the parties recognize[ ] that the final contract would include additional boilerplate' if
there are 'no disputes relating to the boilerplate.'" (quoting *Shann*, 84 F.3d at 77)).  In other words, to
the extent Galanis identifies various "minor" or "technical" changes in the July 1, 2014 draft
agreement, those changes do not "show that there were points remaining to be negotiated such that
the parties would not wish to be bound until they synthesized a writing . . . ." *Powell*, 497 F.3d at
130.  Accordingly, the third *Winston* factor also favors enforcement.

### 4.    Type of Contract Usually Committed to Writing

"Settlements of any claim are generally required to be in writing or, at a minimum, made on
the record in open court." *Ciaramella*, 131 F.3d at 326.  In analyzing whether the parties intended
that a particular settlement agreement be reduced to a writing, "the correct question is whether the
settlement agreement terms are sufficiently complex or involve long time periods, such that there
should be a formal writing." *Hostcentric Technologies, Inc. v. Republic Thunderbolt, LLC*, No. 04 Civ.
1621(KMW), 2005 WL 1377853, at *9 (S.D.N.Y. June 9, 2005); *accord Ciaramella*, 131 F.3d at 326

---

Ex. D at 1-2, and Mr. Turoff has represented that this email "explicitly delineat[ed] each and every term of the
Agreement," Turoff Decl. ¶ 23.

("[T]he complexity of the underlying agreement is an indication of whether the parties reasonably could have expected to bind themselves orally."); *Adjustrite*, 145 F.3d at 551 ("In view of the size of the transaction, the nature of the assets being purchased, and the length of the contemplated employment contracts, the Agreement clearly was of the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts.").

Here, the parties' June 13, 2014 settlement agreement is not particularly complex. For the most part, the agreement involves straightforward and fairly standard terms, such as Defendants' provision of a lump sum payment, Galanis's dismissal of his claims and provision of a release, and confidentiality and non-disparagement provisions. *See, e.g., Renaissance Search Partners v. Renaissance Ltd., L.L.C.*, No. 12 Civ. 5638(DLC), 2013 WL 6839039, at *5 (S.D.N.Y. Oct. 15, 2013) (finding that an agreement that included, *inter alia*, a settlement sum, a letter of apology, a confidentiality clause and a mutual release from liability was "not particularly complex" and therefore not of the type usually reduced to writing). In any event, even if the parties' agreement was of the type that it should have been written (*e.g.*, by virtue of containing "provisions that apply into perpetuity," Pl. Mem. at 10), there was, in fact, a writing in this case in the form of contemporaneous emails memorializing the agreement exchanged by counsel for both sides. *See* Turoff Decl., Ex. D; *Hostcentric Technologies*, 2005 WL 1377853 at *9 (enforcing settlement agreement memorialized through counsel to counsel emails). The fourth *Winston* factor thus weakly favors enforcement.

Accordingly, all four of the *Winston* factors weigh in favor of concluding that the parties intended to be bound by the settlement agreement that they reached both orally and by email on June 13, 2014, notwithstanding the absence of a more formal writing memorializing that agreement.

### C.    Galanis's Rights under the OWBPA

Under the OWBPA, in order to waive by settlement agreement an ADEA claim that was filed in court, an individual must be "given a reasonable period of time within which to consider the

settlement agreement." 29 U.S.C. § 626(f)(2)(B).  "The term 'reasonable [period of] time within

which to consider the settlement agreement' means reasonable under all the circumstances, including

whether the individual is represented by counsel or has the assistance of counsel."  29 C.F.R.

§ 1625.22(g)(4).  The purpose of this requirement is to ensure that "older workers are not coerced or

manipulated into waiving their rights to seek legal relief under the ADEA."  *Powell*, 497 F.3d at 132

(internal quotation marks omitted).  The Senate Report accompanying the OWBPA elaborated as

follows:

> [A] waiver is not valid unless the individual is given a reasonable period of time in
> which to review and consider the settlement agreement. An employee who is
> terminated needs time to recover from the shock of losing a job, especially when that
> job was held for a long period. The employee needs time to learn about the
> conditions of termination, including any benefits being offered by the employer.
> Time also is necessary to locate and consult with an attorney if the employee wants
> to determine what legal rights may exist.

S. Rep. 101-263 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 1509, 1538-39.  "In considering the

reasonableness of [an individual's] opportunity to consider [a] proposed settlement and waiver," the

Court is "guided by Congress' stated goals in enacting the OWBPA."  *Manning v. New York University*,

No. 98 CIV. 3300(NRB), 2001 WL 963982, at *8 (S.D.N.Y. Aug. 22, 2001).

Here, the record indicates that the parties first began to engage in settlement discussions in

March 2014, and that, at the very least, they came close to reaching an agreement with terms

identical their June 13, 2014 agreement on May 28, 2014.[10]  *See* Turoff Decl. ¶¶ 4-7.  The parties'

June 13, 2014 telephone conference thus was not the first time Galanis learned of the settlement

agreement's essential terms.  Moreover, the concerns that motivated the enactment of the OWBPA

do not apply to Galanis, who was represented by counsel throughout the entire settlement process,

and who had not been terminated from his employment with the Club.  Under these circumstances,

---

[10] Although the Court is not required to determine whether the parties' May 28, 2014 agreement is enforceable, *see* n.6, *supra*, the Court nonetheless notes that Galanis's assertion that he did not consent to that agreement is contradicted by a sworn letter that he filed with the Court on June 4, 2014, *see* Dkt. No. 43, Ex. A at 1 ("Please be informed that I have decided, after I thought things through one more time, that I do not want to accept the settlement *that I agreed to previously*." (emphasis added)).

the Court cannot conclude that Galanis lacked a reasonable amount of time to consider the terms of the parties' settlement agreement.  *See, e.g., Powell*, 497 F.3d at 132 (holding that plaintiff had a reasonable period of time to consider a settlement agreement under the OWBPA where "only a few hours elapsed between the beginning of settlement negotiations and [plaintiff's] assent to [the settlement's] terms" because plaintiff was represented by counsel when the agreement was entered into and nearly two years had elapsed since plaintiff was terminated from her employment).[11]

Relatedly, to the extent Galanis asserts that he "felt pressured and threatened" to enter into the parties' settlement agreement, Galanis Aff. ¶ 14, there is no evidence to support this assertion outside of Galanis's own self-serving and conclusory affirmation.  *See Janneh v. GAF Corp.*, 887 F.2d 432, 437 (2d Cir. 1989) (rejecting plaintiff's contention that a settlement agreement should be voided because it was signed under "civil pressure" on the ground that the record was devoid of any evidence that plaintiff had been improperly coerced), *abrogated on other grounds by Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863 (1994); *cf. BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir.1996) (indicating that self-serving and conclusory affirmations, without more, are insufficient to create a triable issue of fact for the purpose of defeating summary judgment).  Moreover, Galanis has not even attempted to demonstrate that the parties' agreement is voidable on the ground that it was procured by duress.  *See, e.g., Dunkin' Donuts Inc. v. Got-A-Lot-A-Dough, Inc.*, No. 04-CV-4100 (DRH)(MLO), 2006 WL 3725340, at *9 (E.D.N.Y. Dec. 18, 2006) ("Duress may not be found merely from the existence of a difficult bargaining position or the pressure of financial circumstances.  To succeed on a theory that an agreement was procured by duress, a plaintiff must show that he was compelled to agree to its terms by way of wrongful and oppressive conduct that precluded the plaintiff from the exercise of his own free will." (internal

---

[11] Galanis's ability to rely on the OWBPA in this context is further undermined the one-month delay between his entering into the settlement agreement on June 13, 2014 and his informing the Court that he had disavowed that agreement on July 14, 2014.  *See Manning*, 2001 WL 963982, at *9 n.11 (indicating that such a delay weighs against finding that a plaintiff lacked a reasonable amount of time to consider a settlement agreement under the OWBPA).

quotation marks omitted)).  The Court thus rejects Galanis's suggestion that the parties' settlement agreement is voidable as a product of duress or coercion.

## IV.   Conclusion

For the foregoing reasons, the parties' June 13, 2014 settlement agreement is enforceable. Defendants' motion to enforce that agreement is thus granted and Galanis's claims are dismissed with prejudice pursuant to the agreement's terms.  The Clerk of Court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

Dated:  October 2, 2014
New York, New York

_____
GREGORY H. WOODS
United States District Judge